UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ARAFAT ALI SALEH,

                Plaintiff,                     **MEMORANDUM AND ORDER**

            v.                          17-CV-4574 (RPK) (CLP)

ANTONY BLINKEN, *Secretary of State-*
*United States Department of State*, UNITED STATES
DEPARTMENT OF STATE, NATIONAL PASSPORT
CENTER, UNITED STATES CUSTOMS AND
BORDER PROTECTION, US ATTORNEY, and
ATTORNEY GENERAL,

                Defendants.
------------------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

      Plaintiff Arafat Ali Saleh brings this action under the Administrative Procedure Act

("APA"), 5 U.S.C. § 701, *et seq.*, alleging that the government's decision to revoke his passport

was arbitrary and capricious. *See* Am. Compl. ¶ 44 (Dkt. #25). The government moves for

summary judgment on the Certified Administrative Record ("AR"). *See* Defs.' Mem. in Supp. of

Mot. for Summ. J. (Dkt. #83-1) ("Defs.' Mem."); Second Revised AR (Dkt. #90) ("AR").

Plaintiff moves for additional discovery pursuant to Federal Rule of Civil Procedure 56(d). *See*

Decl. of Julie A. Goldberg in Opp'n to Defs.' Mot. for Summ J. & for Discovery Pursuant to

Fed. R. Civ. P. 56(d) (Dkt. #86) ("Pl.'s Mem."). For the reasons stated below, plaintiff's motion

for discovery is denied, and defendants' motion for summary judgment is granted.

## BACKGROUND

**I.     Factual Background**

      The following facts are drawn from the AR unless otherwise noted. *See Clifford v. U.S.*

*Coast Guard*, 915 F. Supp. 2d 299, 307 (E.D.N.Y. 2013), *aff'd*, 548 F. App'x 23 (2d Cir. 2013)

(summary order).

1

Plaintiff's father, Ali Nagi Saleh, was born in Yemen in 1952 and first arrived in the United States on June 12, 1969.  *See* AR 36, 60; *cf.* AR 56 (indicating arrival on June 18, 1969). In an affidavit submitted to the United States Department of State ("State Department"), Ali Nagi asserted that he lived in the United States from June 12, 1969, until April 27, 1973.  AR 60. According to that affidavit, Ali Nagi was next in the United States from March 30, 1974, to August 28, 1977.  *Ibid.*  In 1975, he became a naturalized citizen. AR 106. The affidavit states that Ali Nagi was also physically present in the United States from June 19, 1981, to September 8, 1982, and from March 15, 1985, to September 16, 1986.  AR 60.  Ali Nagi died in Yemen on July 30, 1995.  AR 94, 209.

Plaintiff was born in 1983 in Yemen.  AR 207.  Plaintiff has several siblings including, as relevant here, an older brother named Salah and a younger brother named Walid.  *See* Defs.' Mem. 3-4; AR 61 (redacted list of Ali Nagi's children).  At the time of plaintiff's birth in 1983, a child born outside the United States to a United States citizen and "an alien" was eligible for citizenship if the citizen parent "was physically present in the United States" for at least ten years total prior to the child's birth.  *See* 8 U.S.C. § 1401(g), *amended by* Pub. L. No. 99-653, § 12, 100 Stat. 3657 (1986).

In April 1998, plaintiff first applied for a U.S. passport.  *See* AR 203-04.  In support of that application, plaintiff submitted an affidavit that lists different dates for Ali Nagi's time in the United States than Ali Nagi's earlier affidavit.  *See* AR 205.  Plaintiff's affidavit indicates that Ali Nagi was in the United States from June 10, 1969, to April 27, 1973; from March 30, 1974, to August 28, 1978; from June 18, 1981, to September 7, 1982; from March 15, 1985, to September 16, 1986; and from October 25, 1988, to October 7, 1993.  *Ibid.*  Because Ali Nagi

had died and plaintiff could not make a sufficient showing that Ali Nagi was his father, the application was denied.  *See* AR 202.

In July 2006, plaintiff visited the United States Embassy in Yemen to reapply for a passport.  *See* AR 137.  Notes in the Embassy's activity log from plaintiff's 2006 visit suggest that plaintiff had not proved that his father had acquired the requisite ten years of physical presence in the United States.  *See ibid.*  The notes also indicate that plaintiff had again failed to prove his relationship with his father.  *Ibid.*  The AR does not include a passport application related to the 2006 visit.  But notes from November 2006 state that plaintiff "[a]bandoned" the July 2006 attempt to obtain a passport because plaintiff failed to establish a parent-child relationship with a United States citizen.  *Ibid.*

Plaintiff filed another passport application on September 9, 2009.  *See* AR 211.  That day, Salah and Walid also filed passport applications.  *See* AR 68-69, 72-73.  An unsigned affidavit submitted with the applications states that Ali Nagi was physically present in the United States from 1969 to 1973; 1973 to 1978; 1981 to September 8, 1982; March 15, 1985, to September 16, 1986; and October 25, 1988, to October 7, 1993.  AR 74.  The brothers also appear to have submitted a Social Security earnings statement for Ali Nagi that records dates that Ali Nagi earned income in the United States.  *See* AR 76-79; *see also* AR 116-18 (legible copy of the earnings statement).  The statement reflects that Ali Nagi earned income in the United States from 1969 to 1977, as well as in 1981, 1982, and several years after plaintiff was born.  *See* AR 77, 117.  In addition, the brothers submitted other documents in support of their applications like various tax documents, Ali Nagi's naturalization and death certificates, their own birth certificates, and a DNA analysis report.  *See* AR 80-92, 94-126.

An Embassy note from the date of plaintiff's 2009 application suggests that the consular officer was unpersuaded by that evidence. "Real questions on relationship, age[,] and physical presence," the officer wrote, explaining that Ali Nagi's "[s]ocial security earnings and taxes stil[l] may not prove [the necessary ten years of] physical presence" such that any of the brothers qualified for citizenship. AR 139. On January 30, 2010, the Embassy notes indicate that the brothers "came back with bits and pieces" but not enough to establish the required period of physical presence. *Ibid.* That day, the Embassy closed the case. *Ibid.*

On August 4, 2010, plaintiff filed another passport application. *See* AR 213. The Embassy notes from that day state that "[s]ubjects came . . . with nothing new." AR 135. A consular officer was assigned to review the application. *See ibid.*

The consular officer who reviewed plaintiff's 2010 application stated that it was "O.K. [t]o [a]pprove" it. AR 140. The Embassy notes indicate that the officer "reviewed past notes on case and evidence on record." *Ibid.* The officer claimed that Ali Nagi's social security records "show[] earnings from 1961 to 1998." *Ibid.* Relying on those records, the officer concluded that Ali Nagi's earnings proved that his "physical presence [was] sufficient . . . to transmit citizenship to [plaintiff]." *Ibid.*

A consular supervisor then forwarded plaintiff's application, applications from Salah and Walid, and supporting documents to a specialist in the Office of Overseas Citizen Services. *See* Defs.' Mem. 8; AR 142-43. In addition to the applications, the supervisor's email attached scans of Ali Nagi's United States passport, marriage and death certificates, and Social Security earnings report. *See* AR 143, 144-66. The specialist decided that there was "sufficient evidence to prove transmission" of citizenship to plaintiff and told the supervisor that she could "go ahead

4

with" issuing a passport based on the notes in the Embassy log system.  AR 142.  The Embassy then issued passports to plaintiff and his brothers.  *See* Defs.' Mem. 9; AR 131, 140.

On May 24, 2011, Walid filed an Application for Certificate of Citizenship claiming that he acquired citizenship at birth through Ali Nagi.  *See* AR 20.  Along with the application, Walid submitted various supporting documents, including six pages of Social Security benefits statements and copies of certain pages from Ali Nagi's passports.  *See ibid.*  Because Walid had not submitted sufficient evidence from which the U.S. Citizenship and Immigration Services ("USCIS") could conclude that the ten-year physical presence requirement had been met, the government requested Walid provide additional materials.  AR 21-22.  Walid did not respond, and so USCIS denied the application as abandoned under 8 C.F.R. § 103.2(b)(13)(i).  AR 22.  The government also denied the application because Walid had failed to submit sufficient evidence to demonstrate that Ali Nagi had been physically present in the United States for ten years prior to Walid's birth.  AR 22.  The Detroit Field Office of USCIS then sent a memorandum to the State Department on September 16, 2011, requesting that Walid's passport be revoked.  AR 17-19.

It took the State Department almost three years to act on the USCIS request.  On March 20, 2014, a lawyer in the Bureau of Consular Affairs submitted an Advisory Opinion ("AO") recommending that plaintiff's, Walid's, and Salah's passports be revoked "because they presented insufficient evidence to demonstrate their . . . father met the physical presence requirements to transmit . . . citizenship to them."  AR 3; *see* Defs.' Mem. 11.  The AO explains that plaintiff and his brothers were issued passports in 2010 after the consular officer "claimed to have reviewed documentation show[ing] that [their father] was physically present as early as 1961."  AR 11.  But the AO concludes that there was "no such evidence in the record."  *Ibid.*

5

Moreover, the AO notes that Ali Nagi's own affidavits "never alleged that he was physically present prior to June 1969" and failed to allege ten years of physical presence prior to plaintiff's birth. AR 12.

On April 25, 2014, the State Department sent a message to the Embassy "request[ing]" "assistance . . . in the revocation of [a] . . . passport . . . erroneously issued on August 18, 2010[,] to [plaintiff]." AR 223 (capitalization modified). The message stated that the revocation was pursuant to 22 C.F.R. § 51.62(a)(2), which permits the State Department to revoke a passport when certain conditions are met, including that "[t]he passport was illegally, fraudulently[,] or erroneously obtained." And the message said that the revocation was "based upon the . . . finding that [plaintiff's] father . . . did not have sufficient physical presence in the United States to transmit citizenship to plaintiff." AR 223 (capitalization modified). Accordingly, the message ordered the Embassy to "immediately revoke" plaintiff's passport. *Ibid.* (capitalization modified).

The message directed the Embassy to draft a letter to send to plaintiff and dictated some of the language for the letter. AR 223-34. Some of the specified language informed plaintiff that the affidavit attached to plaintiff's 1998 passport application set forth "less than the requisite ten years" of physical presence for plaintiff's father. AR 224 (capitalization modified). The specified language also noted that the information in plaintiff's 1998 affidavit was "corroborated by [Ali Nagi's] Social Security statements." *Ibid.* (capitalization modified). The message to the Embassy required the Embassy to "create a memorandum of record . . . stating the date upon which delivery of the revocation letter was made" and directed the Embassy to "obtain a confirmation of receipt signed and executed by [plaintiff] and notarized by a consular officer." AR 223 (capitalization modified).

Despite the State Department's instructions, the AR does not contain an Embassy memorandum stating the date of delivery of the letter, a receipt, or any other evidence that the Embassy ever drafted the revocation or sent it to plaintiff. *See generally* AR. The AR does include a note that a phone call was made to plaintiff on September 2, 2014, to tell him about the revocation. *See* AR 226. But the note says that plaintiff's mobile phone was "switched off." *Ibid.*

The record indicates that plaintiff's passport was seized by United States Customs and Border Protection ("CBP") on October 19, 2015. *See* AR 227, 229; *see also* Am. Compl. ¶¶ 21-30. Plaintiff was provided with temporary travel documents to continue his journey. Am. Compl. ¶ 27.

On September 27, 2017, the State Department sent plaintiff a letter informing him that his passport had been revoked. *See* AR 230-31. The letter asserts that the State Department had "approved the revocation notification" for the passport "on April 25, 2014," but that State Department "records indicate that previous attempts to notify [plaintiff] of this revocation action in writing may have been unsuccessful." AR 230. After noting the circumstances in which the 2017 letter had been sent, the letter explains that the revocation action was being taken pursuant to 22 C.F.R. § 51.62(a)(2). Unlike the text drafted for the 2014 letter, the 2017 letter focuses on Ali Nagi's 1988 affidavit, which the 2017 letter explains "show[s] [that] [plaintiff's] father was present in the United States for only nine years prior to [plaintiff's] birth." AR 230.

## II.        Procedural Background

Plaintiff filed this lawsuit against the Secretary of State, the State Department, the National Passport Center, and CBP on August 3, 2017.[1]  *See* Compl. (Dkt. #1).  The initial complaint sought a writ of mandamus compelling defendants to issue a passport to plaintiff.  *See id.* ¶ 64.  Plaintiff also brought claims under the APA and 8 U.S.C. § 1503(a).  *See* Compl. ¶¶ 65-82.

Plaintiff subsequently amended his complaint.  *See* Am. Compl.  The amended complaint, which is the operative pleading, includes a single APA claim.  The complaint alleges that defendants acted "arbitrar[ily] and capricious[ly], and not in accordance with law" "[b]y revoking [p]laintiff['s] . . . passport without sufficient evidence."  *Id.* ¶ 44.  The complaint further alleges that defendants' "actions amount to the unlawful withholding of . . . [p]laintiff's . . . passport since [plaintiff] does not fall under the categories of . . . individuals whose passports may be denied or restricted."  *Id.* ¶ 46.  Among other relief, plaintiff seeks an order setting aside the revocation, directing defendants "to reinstate [p]laintiff's passport and return it to him," and an order enjoining future attempts to revoke plaintiff's passport on the same grounds.  *See id.* at 7 ("Prayer For Relief").

Defendants moved to dismiss the amended complaint on the basis that 8 U.S.C. § 1503(a) provides plaintiff with an adequate remedy that forecloses judicial review of agency action under the APA.  *See* Mot. to Dismiss (Dkt. #37).  Over the government's objection, the Court adopted a report and recommendation denying defendants' motion to dismiss and directing the government to produce the complete AR.  *See* Order Adopting Report & Recommendations (Dkt. #53).

---

[1] Plaintiff originally sued Rex Tillerson in his capacity as the Secretary of State.  During the pendency of this action, Antony Blinken became Secretary of State.  Pursuant to Federal Rule of Civil Procedure 25(d), Blinken is substituted for Pompeo.  The Clerk of Court is respectfully directed to amend the caption to reflect that substitution.

Defendants filed a copy of the AR in July 2019. (Dkt. #56). Plaintiff then moved for additional discovery. *See* Pl.'s Letter Mot. (Dkt. #64); Pl.'s Letter dated Feb. 18 2020 (Dkt. #72). Plaintiff argued that the AR was incomplete, that documents in the AR were "completely illegible," and that defendants "selectively picked the affidavits" in the record. Pl.'s Letter Mot. 2; *see* Pl.'s Letter dated Feb. 18, 2020. Plaintiff also identified a number of alleged misrepresentations in the record. *See* Pl.'s Letter Mot. 3-8. In response, defendants filed a new copy of the AR that "include[d] more readable copies of [certain] pages." Defs.' Letter dated Jan. 29, 2020, at 10 (Dkt. #66); *see* First Revised AR (Dkt. #66-1).

On April 20, 2020, Chief Magistrate Judge Pollak denied plaintiff's motion for discovery. *See* Order dated Apr. 20, 2020 (Dkt. #74). Judge Pollak concluded that plaintiff failed to "provide[] any real evidence of . . . bad faith or any support for his claim that there were documents that were before the agency that [were] not . . . included in the [AR]." *Id.* at 16. Accordingly, Judge Pollak found that plaintiff had not "overcome the presumption of regularity that attaches to the agency's certification of the record" such that plaintiff might be entitled to additional discovery. *Id.* at 17.

This case was reassigned to me on February 13, 2020. Defendants initially moved for summary judgment in July 2020. *See* Mot. for Summ. J. (Dkt. #75). The Court denied that motion without prejudice for failure to comply with a prior scheduling order and the Court's Individual Rules and directed defendants to refile the motion. *See* Order dated Aug. 14, 2020. Defendants filed their motion again on August 21, 2020. Plaintiff then filed a letter indicating that plaintiff had discovered new evidence and suggesting that settlement of the case might follow. *See* Pl.'s Letter dated Nov. 11, 2020 (Dkt. #80). In light of that letter, the Court again denied defendants' motion without prejudice. *See* Order dated Nov. 11, 2020.

The parties failed to settle the case, and defendants filed the instant motion for summary judgment on December 23, 2020.  *See* Defs.' Mem.  Plaintiff filed an opposition to the motion and again moved for discovery, invoking Federal Rule of Civil Procedure 56(d).  *See* Pl.'s Mem. Among the alleged problems plaintiff identified in the AR, plaintiff pointed out that two printouts from a website used to calculate dates came from 2016, not 2014 as defendants had represented.  *See id.* at 3.  Defendants then filed a revised copy of the AR with the correct 2014 documents.  *See* Defs.' Letter dated Sept. 17, 2021 (Dkt. #90); AR.  The operative version of the AR also substitutes clearer versions of twenty-four pages that plaintiff had identified as illegible. *See* Defs.' Letter dated Sept. 17, 2021; AR .

## STANDARD OF REVIEW

Under the APA, agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 658 F.3d 200, 215 (2d Cir. 2011) (citation omitted).  "In other words, so long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned."  *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007).

When a party challenges agency action under the APA, the district court acts as an "appellate tribunal" and the case on review presents "a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *see, e.g.*, *N.Y. Legal Assistance Grp. v. DeVos*, 527 F. Supp. 3d 593, 599 (S.D.N.Y. 2021) (applying *Thompson* rule).  Summary judgment is generally an appropriate procedural vehicle to resolve such a case, *see Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020); *Clifford*, 915 F. Supp. 2d at 307 ("[T]he Second Circuit has allowed appeals of agency decisions to be styled as motions for summary judgment . . . ."), but "the usual summary judgment standard under Federal Rule of Civil Procedure 56 does not apply," *Seife v. U.S. Dep't of Health & Human Servs.*, 440 F. Supp. 3d 254, 271 (S.D.N.Y. 2020) (citation omitted).  Instead, the court decides the legal issue of whether the agency's action was arbitrary and capricious, 5 U.S.C. § 706(2)(A), by reviewing "the administrative record compiled by that agency when it made the decision," *Clifford*, 915 F. Supp. 2d at 307 (citing *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997)); *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States*, 489 F. Supp. 3d 106, 128 (E.D.N.Y. 2020) (citing *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995)) (similar); *Pandya v. Jaddou*, --- F. Supp. 3d ----, 2022 WL 257214, at *4 (E.D.N.Y. Jan. 25, 2022) (similar).

Therefore, in an APA case, a court should only consider materials outside the certified administrative record in special circumstances.  As relevant here, a party may seek to supplement the administrative record by showing "that materials exist that were actually considered by the agency decision-makers but are not in the record as filed."  *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 309 (S.D.N.Y. 2012); *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5-6 (D.D.C. 2006).  Alternatively, a court may undertake an "extra-record investigation" where "there has been a strong showing in support of a

claim of bad faith or improper behavior on the part of agency decisionmakers," or "where the absence of formal administrative findings makes [extra-record] investigation necessary in order to determine the reasons for the agency[]" decision. *Hoffman*, 132 F.3d at 14.

## DISCUSSION

Plaintiff's motion for discovery is denied and defendants' motion for summary judgment is granted.

## I.   Plaintiff's Motion for Discovery

Plaintiff moves for discovery under Federal Rule of Civil Procedure 56(d). *See* Pl.'s Mem. 1. Neither Rule 56(d) nor administrative law principles justify discovery here, and so plaintiff's motion is denied.

### A.   APA Discovery

Because it is not clear from plaintiff's submissions whether plaintiff seeks "to include evidence in the record" or asks the Court "to review evidence outside of or in addition to the [AR]," *Pac. Shores*, 448 F. Supp. 2d at 6 (emphasis omitted), I consider both whether supplementing the record is warranted and whether plaintiff is entitled to conduct extra-record discovery. As I explain below, plaintiff has not carried his burden to obtain either form of relief.

#### 1.   Supplementing the Record

"[S]upplementation of the [AR] is the exception, not the rule." *Ali v. Pompeo*, No. 16-CV-3961 (KAM) (SJB), 2018 WL 2058152, at *4 (E.D.N.Y. May 2, 2018) (citation omitted). Ordinarily, "the agency determines what constitutes the whole [AR] because it is the agency that did the considering[] and [is] therefore . . . in a position to indicate initially which of the materials were before it." *Hadwan v. U.S. Dep't of State*, 340 F. Supp. 3d 351, 355 (S.D.N.Y. 2018) (citation omitted). Accordingly, "absent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity" in "properly designat[ing] the [AR]." *Pac.*

12

*Shores*, 448 F. Supp. 2d at 5.   To rebut the presumption of administrative regularity and supplement the AR, a party must show that documents were "actually considered by the agency decision-makers but are not in the record as filed." *Sebelius*, 890 F. Supp. 2d at 309.

As an initial matter, the AR has already been supplemented.   Plaintiff argues that three printouts from "timeanddate.com" that are labeled in the AR's index as "[p]hysical presence calculations completed by attorney reviewing the passport revocation request" were not those considered by the agency decisionmakers.   Pl.'s Mem. 3-4; Index to First Revised AR 1 (Dkt. #66-1)).   While the AR's index identifies those documents as "[u]ndated" and from approximately "April 2014," Index to First Revised AR 1, the copyrights on the printouts run to 2016.   *See* First Revised AR 220-22.   Even if plaintiff is correct that the AR initially omitted the correct 2014 documents considered by the agency, further supplementation is not required because defendants already replaced the 2016 printouts with the 2014 pages.   *See* AR 220-22; *cf. Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 118 (2d Cir. 2013) (explaining that remand for supplementation is warranted where the AR is "insufficient to permit [the Court] to discern [the] agency's reasoning or to conclude that the agency has considered all relevant factors").

Likewise, defendants have supplemented the AR with more legible copies of certain documents that plaintiff identified as difficult to read.   *See* Defs.' Letter dated Sept. 17, 2021; AR.   Indeed, the only document that plaintiff specifies as illegible in his motion, the second page of plaintiff's 2010 passport application, *see* Pl.'s Mem. 16, is legible in the most recent copy of the AR, *see* AR 214.   And to the extent that additional pages remain illegible despite defendants' best efforts to provide clean copies, *see* Defs.' Letter dated Sept. 17, 2021, plaintiff has not

rebutted the presumption of regularity with respect to those pages, *see Pac. Shores*, 448 F. Supp. 2d at 5.

Notwithstanding the 2016 website printouts, plaintiff has not "identif[ied] reasonable, non-speculative grounds for [his] belief that [certain] documents were considered by the agency and not included in the record." *Id.* at 6. Plaintiff appears to seek the inclusion of documents that the consular officer allegedly considered in 2010 when granting plaintiff's passport request, as well as practically all documents in the agency's possession relating to plaintiff. *See* Pl.'s Mem. 12, 14-15, 19, 24, 26-30; Pl.'s Letter dated Mar. 7, 2022, at 8 (Dkt. #98). Plaintiff suggests that the physical copies of those records may have been destroyed in 2015. *See, e.g.*, Pl.'s Reply 6 (Dkt. #93). Some of those documents were already included in the record, like the 2010 consular officer's "good, clear notes" in the Embassy log. Pl.'s Letter dated Mar. 7, 2022, at 8 (quoting AR 142); *see* AR 131 (2010 notes). But plaintiff "has not demonstrated that any of the [other] materials he believes should be in the record *were considered by the State Department decisionmakers* . . . . He just speculates that such documents exist and that they must have been considered." *Ali*, 2018 WL 2058152, at *10 (emphasis added). And plaintiff does not offer a reasonable basis to believe that those materials were ever before the decisionmakers who later revoked his passport, as opposed to those who granted the application in 2010, as he must to supplement the record in this case. *See Sebelius*, 890 F. Supp. 2d at 309.

In short, "plaintiff has not provided . . . any support for his claim that there were documents that were before the agency that have not been included in the [AR]." Order dated Apr. 20, 2020, at 16. There is no meaningful suggestion in plaintiff's submissions, let alone a strong showing, "that the record before the Court [is] not complete." *Dopico v. Goldschmidt*,

14

687 F.2d 644, 654 (2d Cir. 1982); *see* Pl.'s Reply 6.   Accordingly, plaintiff's motion to supplement the AR is denied.

## 2. Bad Faith

Plaintiff alleges that defendants' minor errors in compiling the AR, litigation conduct, failure to send plaintiff notice of the revocation in 2014, and events at the Embassy between 2012 and 2014 require extra-record discovery.   Those allegations do not amount to a "strong showing . . . of bad faith or improper behavior on the part of agency decisionmakers," and so plaintiff's motion for extra-record discovery is denied.  *Hoffman*, 132 F.3d at 14.

The fact that defendants included the 2016 printouts instead of the 2014 printouts in the AR does not constitute bad faith.  *See* Pl.'s Mem. 4-5.   That error does not even "hint[] . . . that evidence of the agency decision-makers' true motives exists outside the [AR]."  *Sell v. United States*, No. 19-CV-3105 (RJD) (RER), 2020 WL 3791847, at *5 (E.D.N.Y. July 7, 2020).   To the contrary, the two sets of documents in question include almost identical calculations about Ali Nagi's physical presence in the United States, *see* First Revised AR 220-22; AR 220-22, and plaintiff does not explain how defendants' error in compiling the AR was anything more than an accident.   While plaintiff argues that defendants' former counsel misled the Court by asserting that "everything that the agency has is [in the AR]," Tr. of Feb. 6, 2020 Hearing 22:3-9 (Dkt. #69); *see* Pl.'s Mem. 5-6, the trivial nature of the error suggests an honest mistake, not "nefarious motives," *Estate of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. 2008).   Plaintiff's "naked assertion of bad faith" about the printout error is therefore insufficient to justify extra-record discovery.  *Citizens Against Casino Gambling In Erie Cnty. v. Stevens*, 814 F. Supp. 2d 261, 265 (W.D.N.Y. 2011).

Plaintiff's argument that defendants engaged in "bad faith litigation tactics" is also misguided.   Pl.'s Mem. 19.   Plaintiff points to the parties' conflict over whether the AR is

sufficiently legible. *Id.* at 17-18. And plaintiff nitpicks whether two of defendants' representations in this case have been accurate. *Id.* at 18. At most, those allegations suggest mistakes by defendants' counsel in representing defendants. But they do not come close to a "strong showing . . . of bad faith or improper behavior on the part of *agency decisionmakers*." *Hoffman*, 132 F.3d at 14 (emphasis added).

Similarly, plaintiff is wrong that defendants' alleged "lack of candor" about whether written notice of the 2014 revocation decision was sent to plaintiff is evidence of bad faith. Pl.'s Mem. 13. As discussed below, the Court concludes that the evidence in the AR is insufficient to establish that written notice was sent to plaintiff in 2014. But defendants' losing argument that the record evidence permits an inference that notice was sent is not frivolous and did not rest on false representations to the Court. *See* AR 223, 226; *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012) (defining a frivolous argument in context of Rule 11 sanctions as a legal position with "no chance of success" (citation omitted)). Plaintiff's criticism of this argument falls short of showing conduct that reflects bad faith on the part of the agency decisionmaker. *Hoffman*, 132 F.3d at 14.

Insofar as plaintiff intends to argue that the failure to give notice itself amounts to bad faith, as I explain below, the notice that defendants sent in 2017 complied with the regulatory scheme. Accordingly, plaintiff's arguments about notice do not "demonstrate willful misconduct by the agency," *Smith Prop. Holdings, 4411 Conn. L.L.C. v. United States*, 311 F. Supp. 2d 69, 84 (D.D.C. 2004), or even "errors in the decisionmaking process" that "[would] not themselves establish bad faith," *Sebelius*, 890 F. Supp. 2d at 315.

Finally, the report prepared by the State Department's Office of Inspector General ("OIG") upon which plaintiff relies falls far short of establishing bad faith. Pl.'s Mem. 23-24,

30; Pl.'s Mem. Ex. D (Dkt. #86-1).  That report concerns allegations that the Embassy in Yemen improperly confiscated passports from United States citizens between 2012 and 2014.  *See id.* Ex. D 2-3, 6, 8-9.  The report found that certain passport seizures at the Embassy that occurred during that time period "did not meet procedural requirements."  *Id.* Ex. D 9.  In addition, the report concluded that where passports had been seized and ultimately revoked, the Embassy may not have given the passport holders appropriate notice.  *Id.* Ex. D 14-15.  Here, plaintiff's passport was not seized at the Embassy and was not seized between 2012 and 2014.  AR 227, 229; *see also* Am. Compl. ¶¶ 21-30 (describing passport seizure).  Plaintiff does not appear to have had any contact with the Embassy during that period, and the revocation of plaintiff's passport occurred almost a year after the last documented instance of an improperly seized passport in the report.  *See* Pl.'s Mem. Ex. D 13 (June 19, 2013 seizure).  Therefore, aside from plaintiff's counsel's *ipse dixit*, *see Ali*, 2018 WL 2058152, at *6, there is nothing in the record to suggest that the report has anything to do with the factual circumstances in this case.  Plaintiff's general allegations of Embassy misconduct accordingly do not constitute a strong showing of bad faith.

For those reasons, plaintiff has not met his burden of offering "hard facts" that bad faith or improper behavior "infected the agency's decision-making process."  *Saget v. Trump*, 375 F. Supp. 3d 280, 342-43 (E.D.N.Y. 2019) (citations omitted).  Plaintiff's motion for extra-record discovery is therefore denied.  *Hoffman*, 132 F.3d at 14.

### B.    Rule 56(d)

Plaintiff's motion for discovery under Rule 56(d) is also denied.  That rule in relevant part permits a court to defer or deny a motion for summary judgment and allow discovery "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to summary judgment. Fed. R. Civ. P. 56(d).  In this circuit, "a

party seeking additional discovery under [Rule 56(d)] must file an affidavit in support of its request . . . [that] must describe: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Gene Code Forensics, Inc. v. City of New York*, 812 F. Supp. 2d 295, 304 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *Shaheen v. Naughton*, 222 F. App'x 11, 13 (2d Cir. 2007) (summary order)).

Since the facts on which plaintiff seeks discovery cannot be considered by the Court unless they are already in the AR, plaintiff has not met his burden to show that he "cannot present facts essential to justify [his] opposition" to summary judgment.  Fed. R. Civ. P. 56(d). As I already explained, a court may supplement the AR or consider extra-record materials in an APA case only under limited circumstances, and plaintiff has not established that those circumstances are present here.   Accordingly, the extra-record facts that plaintiff seeks to introduce through Rule 56(d) discovery cannot raise a genuine factual dispute, *Gene Code Forensics*, 812 F. Supp. 2d at 304, because my review of the agency action is limited to the AR, *see Clifford*, 915 F. Supp. 2d at 307 (citing *Hoffman*, 132 F.3d at 14); *see Hadwan v. U.S. Dep't of State*, No. 17-CV-578 (VEC), 2021 WL 4037714, at *6 (S.D.N.Y. Sept. 3, 2021) (denying Rule 56(d) discovery where party failed to establish grounds for supplementation); *see also Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 23 n.7 (D.D.C. 2020) (Rule 56(d) discovery inappropriate where party has failed to meet burden to show discovery appropriate in APA case in accordance with administrative law principles); *Nicholas v. U.S. Dep't of Treasury*, No. 20-CV-2088 (JEB), 2021 WL 3188324, at *5 (D.D.C. July 28, 2021) (same).

To the extent that plaintiff's claim under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), that defendants failed to provide notice may not be subject to APA discovery principles, *compare Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (suggesting that the APA provides a cause of action to bring a claim under *Accardi*) *with Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) (suggesting that *Accardi* claims are rooted in due process clause); *see Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018) (collecting cases and noting that "the caselaw is far from clear as to whether an *Accardi* claim is properly raised as a substantive due process allegation . . . . [or] as arising under the APA or as [a] stand-alone cause[] of action"), plaintiff is still not entitled to relief under Rule 56(d). Plaintiff appears to seek discovery as to defendants' compliance with certain "regulatory requirements to provide . . . written notice of the revocation." Pl.'s Mem. 33. But as I explain below, that fact is not material because defendants' failure to send notice in 2014 does not "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Therefore, plaintiff has not shown that additional facts about the 2014 attempt to send notice "are reasonably expected to raise a genuine issue of material fact," *Gene Code Forensics*, 812 F. Supp. 2d at 304, as plaintiff must to obtain Rule 56(d) discovery.

For those reasons, plaintiff's motion for discovery under Rule 56(d) is denied.

## II.     Defendants' Summary Judgment Motion

Because the agency's revocation of plaintiff's passport was not arbitrary and capricious, and because defendants complied with their own regulations by sending plaintiff notice of the revocation in 2017, defendants' motion for summary judgment is granted.

### A.     Regulatory Scheme

The Immigration and Nationality Act ("INA") gives the Secretary of State the authority "to cancel any United States passport . . . if it appears that such document was illegally,

19

fraudulently, or erroneously obtained." 8 U.S.C. § 1504(a).  That statute requires "written notice of the cancellation of [the passport]" to "be given[] at [the passport holder's] last known address." *Ibid.*

The State Department has promulgated regulations implementing the INA's passport cancellation provision.  As relevant here, 22 C.F.R. § 51.62(a)(2) permits the State Department to revoke a passport when "[t]he passport was illegally, fraudulently, or erroneously obtained." The regulations in effect between November 2007 and May 2018 also required the State Department to "notify in writing any person . . . whose passport has been revoked."  22 C.F.R. § 51.65(a), 72 Fed. Reg. 64930-01 (Nov. 19, 2007), *amended by* 83 Fed. Reg. 21872-01 (May 11, 2018)).  In turn, under those regulations, the passport became invalid "as soon as . . . [t]he [State] Department has sent or personally delivered a written notice to the bearer stating that the passport has been revoked."  22 C.F.R. § 51.4(f)(1), 72 Fed. Reg. 64930-01 (Nov. 19, 2007) (recodified at 22 C.F.R. § 51.4(g)(1) by 81 Fed. Reg. 67156-01 (Sept. 30, 2016)).  On May 11, 2018, the regulations were amended to render a passport invalid as soon as the State Department "approves the revocation notification pursuant to [Section] 51.65(a)." 22 C.F.R. § 51.4(g)(1), 83 Fed. Reg. 21872-01 (May 11, 2018).

A person whose passport has been revoked may request a hearing within sixty days of receipt of the notice of revocation.  *See* 22 C.F.R. § 51.70(a).

### B.    Arbitrary and Capricious Review

Defendants are entitled to summary judgment on plaintiff's claims that the passport revocation was arbitrary and capricious.

Based on the record, the State Department lawfully revoked plaintiff's passport.  Under 22 C.F.R. § 51.62(a)(2), the State Department "may revoke . . . a passport when . . . [t]he passport was . . . erroneously obtained[.]"  The State Department explained its application of

20

that regulation in the 2017 notice letter sent to plaintiff.  Specifically, the State Department noted that plaintiff's successful 2010 passport application was predicated on showing that plaintiff's father "was physically presented in the United States or its outlying possession for . . . periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years."  AR 230 (quoting 8 U.S.C. § 1401(g)).  But the letter explained that "no evidence" was before the agency that plaintiff lawfully acquired citizenship through his father's physical presence in the United States.  *Ibid.*  And the letter notes that Ali Nagi's affidavit showed nine years of presence in the United States prior to plaintiff's birth.  *Ibid.*  The agency concluded that plaintiff's 2010 passport application had been erroneously granted.  *Ibid.*

Far from being arbitrary or capricious, the agency's reasoning is sound.  Ali Nagi's own affidavit, as well as an affidavit plaintiff prepared in 1998, indicate that Ali Nagi was not physically present in the United States for at least ten years prior to plaintiff's birth in 1983.  *See* AR 60 (asserting that Ali Nagi was in the United States for 3,111 days); AR 205 (asserting that Ali Nagi was in the United States for 3,478 days).  None of the record evidence suggests that he was.  For example, an affidavit submitted with plaintiff's, Walid's, and Salah's 2009 passport does not include sufficient months and days from which periods of physical presence could be calculated.  AR 74.  And neither Ali Nagi's Social Security earnings statement nor the tax documents submitted with the 2009 applications suggests that Ali Nagi was physically present in the United States for at least ten years before plaintiff was born.  *See* AR 80-92, 117.  While the consular officer who granted plaintiff's 2010 application claimed to have reviewed Social Security earnings statements reflecting income starting in 1961, not 1969, such a document does not appear in the AR.  *See* AR 11, 140.  And as the agency's 2014 advisory opinion explains, that officer's analysis contradicted the Social Security evidence in the record, not to mention Ali

Nagi's own affidavit.  *See* AR 12.  Accordingly, it was rational for the agency to conclude that plaintiff's passport was erroneously issued in 2010 and to revoke that passport pursuant to Section 51.62(a)(2).

Plaintiff has offered no reason why the passport revocation was arbitrary and capricious other than mere speculation that the agency considered other documents in 2010, allegedly destroyed in 2015, that would prove plaintiff's father was physically present in the United States for at least ten years.  *See, e.g.*, Pl.'s Mem. 16.  Plaintiff's position amounts to an assumption that the agency *must have had* other materials in 2010 *because* the agency's 2010 decision was correct.  But plaintiff has not shown that the agency considered any documents not included in the AR or that an extra-record investigation is warranted.  *See supra* I.A.  My review of the passport revocation is therefore confined to the record that defendants certified was before the agency when it made the revocation decision.  *Clifford*, 915 F. Supp. 2d at 307 (citing *Hoffman*, 132 F.3d at 14).  On that record, "the agency's path to its conclusion" to revoke plaintiff's passport "may reasonably be discerned," and the passport revocation decision was not arbitrary or capricious.  *Karpova*, 497 F.3d at 268.

## C.    The *Accardi* Doctrine

Finally, plaintiff is not entitled to relief under the *Accardi* doctrine.  *See* Pl.'s Mem. 33; Pl.'s Reply 1-5, 7-8; Pl.'s Letter dated Mar. 7, 2022 at 3-8.  That "judicially-evolved rule ensur[es] fairness in administrative proceedings" by generally requiring agencies to follow their own rules "regulat[ing] the rights and interests of others."  *Montilla*, 926 F.2d at 166, 168; *see Mantena v. Johnson*, 809 F.3d 721, 729 (2d Cir. 2015) (discussing general "principle of administrative law that agencies must comply with their own regulations" (quoting *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015)).  Accordingly, *Accardi* generally "gives aggrieved parties a cause of action" under the APA "to bring an agency's conduct into conformity with

22

'existing valid regulations.'" *Fed. Defenders of N.Y.*, 954 F.3d at 130 (quoting *Accardi*, 347 U.S. at 268); *Velesaca v. Decker*, 458 F. Supp. 3d 224, 236 (S.D.N.Y. 2020) (same).[2]

Here, "[t]he application of the *Accardi* doctrine is not warranted . . . because [the State Department] did not . . . fail to comply with its own regulations." *Clarry v. United States*, 85 F.3d 1041, 1047 (2d Cir. 1996); *cf. Jiang v. Holder*, 310 F. App'x 468, 470 (2d Cir. 2009) (summary order) (no *Accardi* violation where agency cured own procedural error). The State Department first asked for the Embassy's "assistance . . . in the revocation of" plaintiff's passport in April 2014. AR 223. In that message, the State Department directed the Embassy to send plaintiff notice of the revocation and prescribed language for the Embassy to use in the letter. AR 223-24. The record does not include evidence that the Embassy actually sent plaintiff written notice at that time. *See* AR 223-24, 226. But the State Department did not fail to comply with the regulation requiring the agency to "notify in writing any person . . . whose passport has been revoked." 22 C.F.R. § 51.65(a) (Nov. 19, 2007). Rather, the State Department's regulations did not render plaintiff's passport invalid *until* "[t]he [State] Department . . . sent or personally delivered a written notice to . . . [plaintiff] stating that [his] passport [had] been revoked." 22 C.F.R. § 51.4(f)(1) (Nov. 19, 2007). The State Department sent such a notice in 2017, and accordingly, it was at that time that plaintiff's passport became invalid. *See King v. United States*, No. 15-CV-1369 (PSG) (RZx), 2016 WL 11746321, at *2 (C.D. Cal. July 11, 2016) (explaining that under the operative regulatory regime, a passport was "not revoked" and remained "valid" after the State Department told foreign government that a

---

[2] Defendants are mistaken that *Accardi* is limited to its facts or overruled by statute. *See* Defs.' Reply 18 n.11 (Dkt. #91). To be sure, *Accardi* articulated the principle that agencies must comply with their own regulations in the context of reviewing a habeas corpus petition. *See* 347 U.S. at 261. And the habeas statute in effect at the time of *Accardi* has been superseded, as the Supreme Court noted in *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959, 1980 (2020). But courts have continued to apply the broader principle that "government agencies are generally required to follow their own regulations" since the habeas statute was revised. *See, e.g.*, *Fed. Defs. of N.Y.*, 954 F.3d at 130. And *Thuraissigiam* did not call into question that principle.

United States passport had been revoked but before the notice condition in Section 51.4(f)(1) had been satisfied); Defs.' Letter dated Mar. 4, 2022, at 2 (Dkt. #97) (arguing based on the regulatory regime that the revocation occurred in September 2017 when the revocation notice was sent).

Plaintiff next contends that the State Department deprived him of due process because it did not send him a notice of revocation in 2014, s*ee* Pl.'s Reply 1-5; Pl.'s Letter dated Mar. 7, 2022 at 4-8, but that argument is mistaken.  "Procedural due process imposes constraints on governmental decisions *which deprive individuals of 'liberty' or 'property' interests*."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (emphasis added); *see Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).  The State Department's 2014 message to the Embassy did not deprive plaintiff of any such interests, because the decision itself had no effect on plaintiff's passport or other property rights.  As explained above, the relevant regulatory scheme ties invalidation of a passport to the provision of notice.  *See* 22 C.F.R. § 51.4(f)(1) (Nov. 19, 2007).  As such, plaintiff's passport was not invalidated until 2017, when he *was* given notice and an opportunity to be heard regarding the revocation.

Plaintiff protests that he was nevertheless "permanently deprived . . . of the opportunity to present his case before the agency," Pl.'s Reply 4; *see* Pl.'s Letter dated Mar. 7, 2022, at 5, because the State Department did not provide a revocation notice in 2014.  His theory is that Embassy records relevant to his case may have been destroyed in 2015 when the United States closed its Embassy in Yemen.  *See* Pl.'s Reply 4; Pl.'s Letter dated Mar. 7, 2022, at 5.  But as noted above, due process only requires agencies to provide notice of decisions that deprive individuals of liberty or property interests, and the 2014 determination does not fit that bill.  Even beyond that fundamental failing, plaintiff's due process arguments are ill-suited to address

24

the unfairness he alleges regarding possible loss of evidence.  After all, both the underlying statute and the implementing regulations authorize the State Department to cancel a passport whenever the Secretary of State determines that the passport was illegally, fraudulently, or erroneously issued—without any time limitation.  *See* 8 U.S.C. § 1504(a); 22 C.F.R. § 51.62(a)(2).  If the State Department simply decided in 2017 to revoke the passport of a person who had obtained that document through the Embassy in Yemen, the agency would be free to do so—even if the underlying passport application materials had been destroyed.  Even in plaintiff's own case, this theory seems inapposite.  Plaintiff has not explained why—if the 2014 determination he seeks to challenge was invalid for lack of notice—the State Department could not have decided anew to revoke his passport in 2017.  Indeed, even if plaintiff were to prevail in his bid before this Court to "hold unlawful and set aside" any revocation that occurred in 2014, *see* 5 U.S.C. § 706(2), plaintiff has identified no statutory barrier to the agency's revoking his passport again, this time with notice—or, since his passport has now expired, simply declining to issue a new one.  In sum, plaintiff's due process theory is not only unsupported by law but also a poor fit for addressing the risk of document loss that he invokes.

Of course, because plaintiff's passport was still valid when CBP confiscated it at the airport in 2015, *see* AR 227, 229; Am. Compl. ¶¶ 21-30, plaintiff may have claims relating to the 2015 passport confiscation that he did not raise in the operative complaint.  *See* Am. Compl. That would depend in part on whether CBP officials could permissibly confiscate a valid passport—an issue that neither party has briefed.  However, in this suit, plaintiff challenges the agency decision to revoke his passport, and he seeks an order vacating that decision.  *See* Pl.'s Reply 10; Pl.'s Letter dated Mar. 7, 2022, at 9.  Plaintiff does not argue that CBP's possible error in confiscating a valid passport is grounds to vacate the State Department's later invalidation of

the passport or to remand to the agency.  I therefore decline to consider the merits of CBP's

passport confiscation *sua sponte*.

For those reasons, defendants are entitled to summary judgment on plaintiff's APA claim.

## CONCLUSION

Plaintiff's motion for discovery is denied and defendants' motion for summary judgment

is granted. The case is closed.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge


Dated: March 30, 2022
          Brooklyn, New York